## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:   RUBEN PARRA and                                    No. 7-11-14171 JA
         CYNTHIA PARRA,

         Debtors.

SONNY PENIX,

         Plaintiff,

v.                                                         Adversary No. 11-1232 J

RUBEN PARRA and
CYNTHIA PARRA,

         Defendants.

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court following a trial on the merits of this adversary

proceeding to determine the dischargeability of certain debt owing to Plaintiff Sonny Penix

("Plaintiff" or Mr. Penix) that arose during the course of an oral agreement between Defendant

Ruben Parra ("Defendant" or Mr. Parra) and Mr. Penix regarding the sale of used vehicles on

consignment.   Plaintiff was represented by Stephen M. Curtis.   Defendants Ruben Parra and

Cynthia Parra were represented by Gregory Baca.  As a preliminary matter, Defendants moved to

dismiss all claims against Defendant Cynthia Parra on grounds that the Plaintiff has not alleged

that Ms. Parra participated in any actions relating to the debt that Plaintiff asserts is non-

dischargeable.  With the parties' agreement, the Court granted the motion to dismiss Ms. Parra

from this adversary proceeding, provided that any determination that the debt is a non-

dischargeable community debt will be binding as to Ms. Parra.    At trial Defendant Ruben Parra

invoked his Fifth Amendment privilege against self-incrimination and declined to answer most

of the questions asked of him by Plaintiff's counsel on direct examination.

After consideration of the evidence and testimony admitted at trial, and being otherwise sufficiently informed, the Court finds that a portion of the debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A) or 11 U.S.C. § 523(a)(6). The nondischargeable debt falls into two categories: first, where Mr. Parra sold a vehicle under a duplicate title; and second, where Mr. Parra provided Mr. Penix with a title for a car that already had been sold as a substitute title. The remainder of the debt at issue in this adversary proceeding is dischargeable.

FACTS

Defendant Ruben Parra is a car salesmen who operated a retail used car sales business under the name Horizon Car Sales. Initially, Mr. Parra ran his business from a location on Juan Tabo Boulevard in Albuquerque, New Mexico. Later Mr. Parra moved his business to a location on Lomas Boulevard in Albuquerque, New Mexico.

Plaintiff Sonny Penix has been in the car business since 1977. He has operated both wholesale and retail used car sales businesses. Mr. Penix operated his retail and wholesale car businesses under the name Car Corporation. After Mr. Penix stopped selling cars at retail, he continued to operate a wholesale car sales business located on Wyoming Boulevard in Albuquerque, New Mexico.

Mr. Parra first met Mr. Penix approximately ten or twelve years ago when Mr. Parra came to Mr. Penix's wholesale used car sales operation on Wyoming Boulevard. Mr. Parra began purchasing some cars from Mr. Penix for sale at Mr. Parra's retail used car sales operation on Juan Tabo. Later, after Mr. Parra moved his business to Lomas Boulevard, Mr. Parra and Mr. Penix significantly increased their business dealings. From 2002 through 2007 Mr. Parra and Mr. Penix enjoyed a mutually beneficial business relationship and Mr. Penix considered Mr. Parra a friend. In approximately 2008, Mr. Parra's business suffered a decline due in large part

Case 11-01232-j    Doc 23    Filed 09/18/12    Entered 09/18/12 10:48:56 Page 2 of 28

to the ailing economy. He eventually closed his business. He now just buys and sells an average of two vehicles a month as a private citizen without a license.

Defendants filed their voluntary petition under Chapter 7 of the Bankruptcy Code on September 21, 2011. Mr. Parra listed Mr. Penix as a creditor in his bankruptcy case as holding a claim of $75,000.00. *See* Case No. 7-11-14171 JA, Schedule F - Docket No.1   Mr. Penix filed this adversary proceeding on December 21, 2011.

The Parties' Agreement

Mr. Penix placed used vehicles on Mr. Parra's lot on consignment for sale by Mr. Parra to the public. Under the parties' oral agreement, Mr. Penix would purchase vehicles that Mr. Parra would agree to place on his retail car sales lot.   Mr. Penix would hold the titles to those vehicles until Mr. Parra sold the vehicles and paid Mr. Penix an agreed amount (the "Agreed Amount") for the vehicle plus a $500.00 fee (the Agreed Amount plus the $500.00 fee hereinafter is called the "Release Price."). Mr. Penix would then release the title to Mr. Parra. The parties maintained a list of the vehicles sold on consignment, including the last four digits of the vehicle identification number, the make and model of the vehicle, and the Release Price which included the $500.00 fee. *See* Exhibit 24.   Sometimes Mr. Parra would finance the sales of the vehicles himself, but most of the time Mr. Parra would sell the chattel paper to finance companies.   Mr. Parra would pay Mr. Penix for vehicles that Mr. Parra sold from his lot with a check, and instruct Mr. Penix to hold the check for a period of time, typically seven to ten days, until Mr. Parra could sell the chattel paper. Upon sale of the chattel paper, Mr. Parra would tell Mr. Penix that he should deposit the checks.

The parties' business dealings were fairly relaxed and evolved over time.   Towards the end of their business relationship, Mr. Parra and Mr. Penix would "swap title."   When Mr. Parra

could not sell the chattel paper or otherwise pay Mr. Penix the Release Price for the vehicle, Mr.

Parra would pay Mr. Penix the $500.00 fee, but swap a title by providing Mr. Penix with a

substitute vehicle title to secure the Agreed Amount for the vehicle Mr. Parra sold.[1]  Mr. Parra

testified in his deposition that the vehicle titles that he "swapped" were "titles that Horizon had

liens on, whether they would be customers that I sold them to and got them back in trade, or in

some cases repos that I got back that I owned."  *See* Exhibit 25 -  Parra Deposition, p. 19, lines 6

- 9.

Sometime in February of 2009, Mr. Penix stopped by Mr. Parra's office to complain that

he was "broke" since he knew that Mr. Parra owed him a significant amount under their oral

agreement.   Mr. Penix was not satisfied with the outcome of that meeting, so he went to Mr.

Parra's car sales lot early one Sunday morning to look for the vehicles for which he believed he

still held the titles; Mr. Penix was not able to locate any of the vehicles on the lot.  The following

day Mr. Penix consulted an attorney.   Mr. Penix's attorney sent a demand letter to Mr. Parra

seeking payment.  Mr. Penix never sought to recover the vehicles at issue from Mr. Parra and did

not ask Mr. Parra the whereabouts of those vehicles following Mr. Penix's visit to Mr. Parra's

car sales lot in February of 2009.  Mr. Penix conducted his own investigation using CarFax in an

attempt to ascertain the status of the vehicles for which he believed he still held the title and for

---

[1]*See* Exhibit 25 -  Deposition of Ruben Parra dated May 24, 2011 ("Parra Deposition"):

> A.     Let's say, for example he [Mr. Penix] had a title on a vehicle that I sold.  And I
> would say, Sonny, bring me this title. Okay.  Here's your $500 and I'm going to
> substitute the cost of this title with this other title.
>
> **Q.     So he [Mr. Penix] bought the car.  The car was in his name.  Let's say he
> bought the   car for $2,009 and you give him 500 on top of that.  How would
> you give him his 2,000?**
>
> A.     That's substituting the title.  This title assumed the cost of the title that he left me.

Parra Deposition, p. 19, lines 14 – 22.

which Mr. Parra owed him the Agreed Amount or the Release Price. CarFax reports are commonly used in the car sales industry to obtain information about a vehicle's title history.

<u>The Cars</u>

Mr. Penix asserts that there are eighteen vehicles that he provided to Defendant Parra for which he did not receive payment of the Agreed Amount or in some cases the Release Price. In some instances Mr. Parra obtained a duplicate title for a vehicle, sold the vehicle using the duplicate title, did not obtain the title from Mr. Penix, and did not pay Mr. Penix for the vehicle or give him substitute collateral. In other instances, Mr. Parra provided Mr. Penix with a substitute vehicle title as security for another vehicle that Mr. Parra had sold on consignment, but the substitute title was for a vehicle that Mr. Parra had already sold. Consequently, the substitute title was no longer valid. On other occasions, Mr. Parra would provide Mr. Penix with a substitute title for a vehicle sold on consignment, and then sell the vehicle for which the substitute title was given without paying for or obtaining the title for that vehicle from Mr. Penix.

The evidence presented relating to each vehicle at issue in this adversary proceeding is summarized below:

1. 1999 Pontiac Grand Am

   The certificate of title for this vehicle reflects that the vehicle was sold and assigned to Garcia Mitsubishi, and then reassigned by Garcia Mitsubishi to The Auto Exchange. *See* Exhibit 1. No evidence was presented that would indicate that Mr. Parra ever sold this vehicle. Although this vehicle appears on the list of Mr. Penix's vehicles consigned by Mr. Penix to Mr. Parra, the vehicle title in evidence does not reflect any interest in the vehicle by either Mr. Penix or Mr. Parra. Mr. Penix testified that the CarFax report for this vehicle reflected that there was no transfer of the vehicle since Mr. Penix purchased it. Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February 2009. The Release Price for this vehicle reflected on the parties' list is $3,200.00. *See* Exhibit 24. Mr. Penix acknowledged that this car "wasn't selling." When questioned about this vehicle at is deposition, Mr. Parra testified that this car was still in stock, but that he had it moved to storage. *See* Exhibit 25 – Parra Deposition, p.31.

5

2. 1994 Ford Escort

The certificate of title for this vehicle reflects that title to this vehicle was assigned in blank by Lomas Auto Sales. *See* Exhibit 2. Mr. Penix testified that the CarFax report for this vehicle reflected that a new or duplicate title was issued for this vehicle *after* the time that Mr. Parra gave the title to this vehicle to Mr. Penix as security for another vehicle. The Release Price for this vehicle reflected on the parties' list is $2,600.00. *See* Exhibit 24. Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February 2009. When questioned about this vehicle at his deposition, Mr. Parra testified that this vehicle was totaled and the folks who purchased the vehicle did not have insurance. *See* Exhibit 25 – Parra Deposition, p. 35. Mr. Parra did not collect from the purchasers on this vehicle; Mr. Parra did not pay Mr. Penix for this vehicle. *Id.* at p. 38.

3. 1994 Chevrolet Lumina

No evidence was presented that would indicate that this vehicle was sold or re-sold after Mr. Penix purchased this vehicle. The certificate of title for this vehicle reflects that Horizon Car Sales is the lienholder. *See* Exhibit 3. Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February 2009. The Release Price for this vehicle reflected on the parties' list is $2,600.00. *See* Exhibit 24.

4. 1992 Isuzu Rodeo

The certificate of title for this vehicle reflects that this vehicle was assigned in blank by the then owner, Lomas Auto Sales. *See* Exhibit 4. No evidence was presented that Mr. Parra sold this vehicle after Penix purchased this vehicle. Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February 2009. The Release Price for this vehicle reflected on the parties' list is $2,000.00. *See* Exhibit 24.

5. 2000 Ford Explorer

The certificate of title for this vehicle reflects that Horizon Car Sales is the lienholder, and that Horizon Car Sales released its lien on April 11, 2007. *See* Exhibit 5. Mr. Penix testified that the CarFax report reflected that a new or duplicate title was issued for this vehicle *after* the time that Mr. Parra gave the title to this vehicle to Mr. Penix as security for another vehicle. The Release Price for this vehicle reflected on the parties' list is $3,000.00. *See* Exhibit 24. Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February 2009.

6. 1998 Buick LeSabre

The certificate of title for this vehicle reflects that Horizon Car Sales is the lienholder, and that Horizon Car Sales released its lien on November 15, 2007. *See* Exhibit 6. Mr. Penix testified that the CarFax report for this vehicle reflected that a duplicate title for this vehicle was issued and the vehicle was sold *after* Mr. Penix received the title to this vehicle as security for another vehicle. The Release Price for this vehicle reflected on the parties' list is $2,900. *See* Exhibit 24. Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February 2009.

7. 1999 Dodge

The certificate of title for this vehicle reflects that Horizon Car Sales is the lienholder, and that Horizon Car Sales released its lien on December 1, 2007. *See* Exhibit 7. Mr. Penix testified that the CarFax report reflected that this vehicle was sold eleven months before Mr. Penix was given the title to this vehicle as security for another vehicle, and that the vehicle had been in an accident. The Release Price for this vehicle reflected on the parties' list is $2,850.00. *See* Exhibit 24. Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February 2009. When questioned about this vehicle at his deposition, Mr. Parra testified that his notes did not reflect what happened to this vehicle, but that he knew Horizon Car Sales had repossessed the vehicle because it was documented on the card and there was a handwritten collection letter. *See* Exhibit 25 – Parra Deposition, p. 48.

8. 1999 Oldsmobile

The certificate of title for this vehicle reflects that Lomas Auto Sales, the then owner of the vehicle, assigned the title in blank. *See* Exhibit 8. No evidence was presented that would indicate that Mr. Parra sold this vehicle after Mr. Penix purchased this vehicle. Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February 2009. The Release Price for this vehicle reflected on the parties' list is $2,850.00. *See* Exhibit 24. When questioned about this vehicle at his deposition, Mr. Parra testified that this vehicle had been vandalized and towed off to the crusher. *See* Exhibit 25 - Parra Deposition, p. 60.

9. 1991 Toyota Previa

The certificate of title for this vehicle reflects that Horizon Car Sales is the first lienholder. *See* Exhibit 9. The CarFax report reflected that this vehicle was sold a year before Mr. Penix received the title to this vehicle as substitute security. Mr. Penix did not see the vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February of 2009. The Release Price for the vehicle reflected on the parties' list is $2,500.00. *See* Exhibit 24. When questioned about this vehicle at his deposition, Mr. Parra testified that he sold this vehicle to Gigante Auto Parts and

7

Sales for $500.00 and did not pay Mr. Penix for the vehicle. *See* Exhibit 25 – Parra Deposition, p. 64.

10.  1999 Ford Expedition

The certificate of title for this vehicle reflects that Horizon Car Sales is the first lienholder.  *See* Exhibit 10.  Mr. Penix testified that the CarFax report for this vehicle reflected that a duplicate title was issued for this vehicle and that the vehicle was sold after Mr. Penix received the title to this vehicle as security for another vehicle.  Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February of 2009.  The Release Price for the vehicle reflected on the parties' list is $4,220.00.  *See* Exhibit 24.

11. 1992 Lincoln

The certificate of title for this vehicle reflects that the owner is Joann C Mueller-Findlay. *See* Exhibit 11. Mr. Parra admitted in his deposition that he obtained a duplicate title for this vehicle without Mr. Penix's knowledge.  *See* Exhibit 25 - Deposition of Ruben Parra dated May 24, 2011 ("Parra Deposition"), p. 66.  Mr. Penix testified that the CarFax report for this vehicle indicated that a duplicate title was obtained for this vehicle.  Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February of 2009.  The Release Price for this vehicle reflected on the parties' list is $2,000.00.  *See* Exhibit 24.

12. 1995 Isuzu Rodeo

The certificate of title for this vehicle reflects that Horizon Car Sales is the first lienholder.  *See* Exhibit 12.  Mr. Penix testified that the CarFax report for this vehicle reflected that this vehicle was wrecked and reported a total loss to the insurance company.  Mr. Penix testified further that Mr. Parra gave him the title to this vehicle as security for another vehicle *after* the 1995 Isuzu Rodeo had been wrecked.   Mr. Penix did not see this vehicle on the car sales lot when Mr. Parra's car sales lot in February of 2009.  When questioned about this vehicle at his deposition, Mr. Parra testified that "made a note I could not locate this vehicle for whatever reason" and that the vehicle remains outstanding. *See* Exhibit 25 - Parra Deposition, p. 65.  The Release Price for this vehicle reflected on the parties' list is $3,500.00.  *See* Exhibit 24.

13. 1999 GMC

The certificate of title for this vehicle reflects that Lomas Auto Sales reassigned the title to this vehicle to Horizon Car Sales.  *See* Exhibit 13.  Mr. Penix testified that the CarFax report for this vehicle did not reflect any additional information, but that the vehicle was not on Mr. Parra's car sales lot when Mr. Penix visited Mr. Parra's car sales lot in February of 2009.  When questioned about this vehicle at his deposition, Mr. Parra testified that this vehicle "was involved in an accident and totaled or stolen

or whatever it was." *See* Exhibit 25 – Parra Deposition, p. 62. Mr. Parra did get paid on the car from the insurance, but did not pay Mr. Penix for the vehicle. *Id.* at p. 63. Mr. Parra also admitted that he obtained a duplicate title for this vehicle for the purpose of "collect[ing] immediately on that." *Id.* at p. 64. Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February of 2009. The Release Price for this vehicle reflected on the parties' list is $6,800.00. *See* Exhibit 24.

14. 2002 Suzuki

The certificate of title for this vehicle reflects that Horizon Car Sales was the first lienholder and that its lien was released on July 8, 2008. *See* Exhibit 14. Mr. Penix testified that the CarFax report for this vehicle reflected that a new or duplicate title was issued for this vehicle. When questioned about this vehicle at his deposition, Mr. Parra testified that he did not pay Mr. Penix for this vehicle, that he assumed that he got a duplicate title for this vehicle without Mr. Penix's knowledge. *See* Exhibit 25 – Parra Deposition, pp. 67-68. The Release Price for this vehicle reflected on the parties' list is $4,000.00.

15. 2000 Mitsubishi

The certificate of title for this vehicle reflects that Horizon Car Sales was the first lienholder and that its lien was released on June 27, 2008. *See* Exhibit 15. Mr. Penix testified that the CarFax report for this vehicle reflected that a new or duplicate title was issued for this vehicle such that the title to this vehicle that Mr. Penix received as security was invalid at the time Mr. Parra provided it to Mr. Penix. The Release Price for this vehicle reflected on the parties' list is $5,150.00.

16. 1994 Isuzu Rodeo

The certificate of title for this vehicle reflects that Horizon Car Sales was the first lienholder, that Horizon Car Sales released its lien on January 19, 2008, and that Amalia Torrez conveyed title to this vehicle to Horizon Car Sales on the same date. *See* Exhibit 16. When questioned about this vehicle at his deposition, Mr. Parra testified that he sold this vehicle for $850.00. *See* Exhibit 25 – Parra Deposition, p. 72. He also admitted that that he obtained a duplicate title for this vehicle and did not notify Mr. Penix. *Id.* at p. 73. Mr. Penix testified that the CarFax report for this vehicle did not indicate whether a duplicate title had been issued. Mr. Penix did not see this vehicle on the car sales lot when he visited Mr. Parra's car sales lot in February of 2009. The Release Price for this vehicle reflected on the parties' list is $2,500.00. *See* Exhibit 24

17. 1994 Jeep

The certificate of title for this vehicle reflects that Horizon Car Sales is the first lienholder. *See* Exhibit 17. Mr. Penix testified that the CarFax report reflected that

the car was sold eight months before the time that he received the title to this vehicle as security for another vehicle. Mr. Penix testified further that it is possible that the car may have been repossessed so that the title he received "may be good" but that the whereabouts of this vehicle is unknown. The Release Price for this vehicle reflected on the parties' list is $2,500.00. *See* Exhibit 24.

18. 2002 Mitsubishi Galant

The certificate of title for this vehicle admitted into evidence at trial reflects that Garcia Honda assigned the title to this vehicle to The Auto Exchange. *See* Exhibit 18. Mr. Penix did not obtain a CarFax report for this vehicle. Mr. Penix testified that he provided this vehicle to Mr. Parra before Mr. Penix had title to this vehicle, that Mr. Parra sold the vehicle to a customer and financed it himself, but that Mr. Penix did not know the terms of the deal. When questioned about this vehicle at his deposition, Mr. Parra testified that "this is the one we never got a title to or he [Mr. Penix] never got a title to" and that "it was a crazy deal." *See* Exhibit 25, Parra Deposition – p. 43. Mr. Parra testified further that he financed this vehicle, that the purchaser made two or three payments, and that he thought that the purchaser wrecked the car soon after he purchased it. *Id.* at p. 44. Mr. Penix was aware that this vehicle had been wrecked. *Id.* The Release Price for this vehicle reflected on the parties' list is $3,600.00 *See* Exhibit 24.

The Checks

There are five checks written by Mr. Parra on the checking account of Horizon Car Sales, LLC that remain outstanding. The checks are all made payable to Mr. Penix's business, Car Corporation, and were delivered upon the understanding of the parties that Mr. Penix should hold the checks for a couple of weeks until Mr. Parra could sell the chattel paper. Each of the checks includes a notation describing a vehicle. Those checks are:

| Check No. | Date | Amount | Notation |
|---|---|---|---|
| 2170 | May 23, 2008 | $4,820.00 | '06 Dodge #7351 |
| 2171 | May 23, 2008 | $3,700.00 | '99 Mazda #9956 |
| 2236 | June 30, 2008 | $3,450.00 | '99 Pont #4316 |
| 2304 | July 31, 2008 | $4,700.00 | '02 GMC #3862 |
| 2305 | July 31, 2008 | $3,850.00 | 02 Chrys Sebring #9085 |

10

Mr. Parra never instructed Mr. Penix to deposit these checks. Nor did Mr. Penix contact Mr. Parra after the parties' customary waiting period had passed to ask whether the checks could be deposited. Eventually, upon advice of counsel, Mr. Penix attempted to negotiate the checks, but because the checks were dated more than six months earlier, the bank refused to honor the checks. Mr. Parra provided Mr. Penix with three or four additional checks dated later than the dates reflected on the five checks at issue in this adversary proceeding. Mr. Penix deposited those additional checks within six months of the date of each check, and they all cleared the bank. At the time Mr. Parra presented Mr. Penix with the five checks at issue, he intended to make the checks good. At the time Mr. Penix received the checks from Mr. Parra, Mr. Penix felt that Mr. Parra intended to pay. None of vehicles noted on the five checks identified above is a vehicle at issue in this adversary proceeding.

DISCUSSION

The Complaint to Determine Dischargeability of Debt ("Complaint") references 11 U.S.C. §§ 523(a)(2) and (4), but does not specifically reference 11 U.S.C. § 523(a)(6). The Pre-trial Order, which supersedes the Complaint, does not reference any specific subsection of 11 U.S.C. § 523, but merely states that the action seeks to "determine dischargeability of a debt." *See* Pre-Trial Order, p. 1 - Docket No. 16. At trial, Plaintiff asserted that several of the transactions at issue constituted conversion of Mr. Penix's collateral, and that the resulting debt should be declared non-dischargeable under 11 U.S.C. § 523(a)(6). Defendant objected to Plaintiff's attempt to assert a non-dischargeability claim for willful and malicious injury under 11 U.S.C. § 523(a)(6), pointing out that neither the Complaint nor the Pre-trial Order specifically mentions 11 U.S.C. § 523(a)(6).

11

Whether to allow an issue allegedly not identified in the pre-trial order or other pleading to nevertheless be considered at trial falls within the Court's discretion. *See Hernandez v. Musgrave (In re Musgrave),* 2011 WL 312883, *3 (10th Cir. BAP 2011)(unpublished)(stating that claims of error based on surprise or failure to plead are reviewed under an abuse of discretion standard)(citing *Matter of Schwager,* 121 F.3d 177, 187 (5th Cir. 1997)). *See also, In re Rafter Seven Ranches L.P.,* 546 F.3d 1194, 1200 (10th Cir. 2008))(applying abuse of discretion standard of review to bankruptcy court's decision to allow issue allegedly not identified in the pretrial order or other pleadings to be considered in deciding the case). Because the purpose of a pre-trial order "'is to clarify the real nature of the dispute at issue, attorneys at a pre-trial conference must make a full and fair disclosure of their views as to what the real issues of the trial will be.'" *Youren v. Tintic School Dist.,* 343 F.3d 1296, 1304 (10th Cir. 2003)(quoting *Rios v. Bigler,* 67 F.3d 1543, 1549 (10th Cir. 1995)(internal quotation marks omitted)).[2] Here, the Pre-Trial Order was silent as to the non-dischargeability subsections Plaintiff intended to pursue. Plaintiff had an obligation to set forth its claim in the Pre-Trial Order so that Defendant would have a sufficient opportunity to prepare his defense for trial. On the other hand, "[t]he Pretrial Order should 'be liberally construed to cover any of the legal or factual theories that might be embraced by their language.'" *Miner v. Beneficial Mortg. Co. of Kansas, Inc. (In re Miner),* 369 B.R. 655, 672 (citing *Lohman & Rauscher, Inc. v. YKK (U.S.A.) Inc.,* 477 F.Supp.2d 1147, 1151-52 (D.Kan. 2007)(quoting *Trujillo v. Uniroyal Corp.,* 608 F.2d 815, 818 (10th Cir. 1979))(additional internal quotation marks omitted)).

---

[2] *See also R.L. Clark Drilling Contractors v. Schramm, Inc.,* 835 F.2d 1306, 1308 (10th Cir. 1987)(noting that "'[c]ounsel bear a substantial responsibility for assisting the court in identifying the factual issues worthy of trial. If counsel fail to identify an issue for the court the right to have the issue tried is waived.'")(quoting Fed.R.Civ.P. 16, advisory committee's notes to the 1983 amendment, subdivision (c)).

Based on a review of the Complaint and the Pre-trial Order, the Court finds that Defendant was put on sufficient notice that Plaintiff was asserting a claim for conversion under 11 U.S.C. § 523(a)(6) notwithstanding Plaintiff's failure to make a specific reference to subsection (6) of 11 U.S.C. § 523. Paragraphs 13 and 14 of the Complaint state that "Ruben Parra fraudulently obtained duplicate titles to the vehicles and sold them without obtaining the titles that were held by Penix" and that "[e]ach of the 18 vehicles described above were converted to Ruben Parra's own use when he sold the vehicles and did not obtain the titles from Penix and did not pay Penix for the vehicles that had been sold." Complaint, ¶¶ 13 and 14. Similarly, in the Pre-trial order, Plaintiff claimed that "Parra sold vehicles purchased by Penix by obtaining duplicate titles and failed to pay Penix." *See* Pre-Trial Order, p. 2. No additional evidence was necessary to be presented at trial in order to support a cause of action under 11 U.S.C. § 523(a)(6). The only additional burden Defendant faced was having to defend against another legal theory premised on the same set of facts.[3] A pretrial order "is a procedural tool to facilitate the trial of a lawsuit on its merits and not to defeat it on a technicality." *Century Refining Co. v. Hall,* 316 F.2d 15, 20 (10th Cir. 1963). Based on the foregoing, the Court will consider the evidence presented at trial to determine whether Plaintiff has established a claim under 11 U.S.C. § 523(a)(6) as well as the subsections of 11 U.S.C. § 523(a) enumerated in the Complaint.

---

[3] In *Hardesty v. Goseland,* 114 B.R. 263 (D.Kan. 1990) the district court reversed the bankruptcy court's refusal to allow Plaintiff to amend the pre-trial order to include a non-dischargeability claim under 11 U.S.C. § 523(a)(6) where Plaintiff had included a claim under 11 U.S.C. § 523(a)(6) in his original complaint but voluntarily withdrew the claim in the pre-trial order. Plaintiff sought to reinstate his claim under 11 U.S.C. § 523(a)(6) six days before trial. *Id.* at 264. The *Hardesty* court reasoned, in part, that 1) the defendant could not be unduly prejudiced or surprised, since the plaintiff had included such a claim in the complaint; 2) the only prejudice defendant would have faced was the burden of having to defend on an additional legal theory; and 3) including the claim would not cause a disruption to the orderly and efficient trial of the case. *Id.* at 271-272. The Court recognizes that *Hardesty* is distinguishable from the instant proceeding inasmuch Plaintiff never included a specific claim under 11 U.S.C. § 523(a)(6) in the Complaint or in the Pre-trial Order.

13

Another preliminary issue raised by the Defendant in the Pre-trial order is whether Plaintiff was required to assert the claims through a corporation, Car Corporation, against Defendant's business entity, Horizon Car Sales. *See* Pre-Trial Order, pp. 3 -4 (asserting that Plaintiff's claims "arise solely from a contractual relationship between Car Corporation and Horizon Car Sales, LLC."). The evidence reflects that Plaintiff and Defendant conducted their businesses under the names Horizon Car Sales and Car Corporation. Mr. Parra's deposition testimony reflects that Horizon Car Sales was formed as a limited liability company, but there is no evidence whether Mr. Penix's business, Car Corporation, was operated as a corporation or a sole proprietorship.

The evidence establishes that Mr. Penix and Mr. Parra had an oral agreement with each other, and that Mr. Parra's individual actions form the basis of Mr. Penix's claims. Mr. Parra may be held personally liable for his own wrongful acts even though he may also be acting on behalf of his business entity. *See Bombardier Capital, Inc. v. Tinkler (In re Tinkler),* 311 B.R. 869, 875 (Bankr.D.Colo. 2004)(recognizing that "if the corporation has committed a tort and [the debtor's] individual actions, as opposed to his general corporate control, caused the corporation's tortious act, then he may be held liable to account.")(citation omitted).[4] And because the oral agreement was between the two individuals and there is no evidence that Car Corporation was an incorporated entity, the Court declines to find that Car Corporation, rather than Mr. Penix individually, is the real party in interest. Thus, the Court concludes that Mr. Penix may assert his non-dischargeability claims against Mr. Parra.

A.   11 U.S.C. § 523(a)(4) – Fiduciary Capacity

---

[4]*See also Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.),* 760 F.2d 121, 125 (6th Cir. 1985)(stating that "'[i]t is well established that a corporate officer or agent is personally liable for torts committed by him *even though he was acting for the benefit of the corporation.*'")(quoting *A & M Records, Inc. v. M.V.C. Distributing Corp.,* 574 F.2d 312, 314-15 (6th Cir. 1978)(emphasis added by *Interstate Agency*)).

Pursuant to 11 U.S.C. § 523(a)(4), debts "for fraud or defalcation while acting in a fiduciary capacity" are non-dischargeable. Plaintiff argues that Mr. Parra held the vehicles that were subject to the parties' oral agreement in a fiduciary capacity for the benefit of Mr. Penix.[5] This Court disagrees.

The fiduciary relationship contemplated by 11 U.S.C. § 523(a)(4) is extremely narrow; it only arises when there is an express or technical trust, and must exist prior to and not a result of the wrongdoing. *See Duncan v. Neal (In re Neal),* 324 B.R. 365, 370 (Bankr.W.D.Okla. 2005), *aff'd,* 342 B.R. 384 (10th Cir. BAP 2006)("The Tenth Circuit has taken a very narrow view of the concept of fiduciary duty under this section."); *Allen v. Romero (In re Romero),* 535 F.2d 618, 621 (10th Cir. 1976)(stating that "[t]he exemption under §17(a)(4) [the predecessor under the former Bankruptcy Act to §523(a)(4)] applies only to technical trusts and not to those which the law implies from contract.")(citation omitted). *See also, Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 154, 79 L.Ed.3d 393 (1934)(noting that the debtor "must have been a trustee before the wrong and without reference thereto."). An express trust is requires an intent to create a trust, a clearly defined trust *res,* and specific trust duties.[6] A technical trust can arise as a result of a state statute that imposes specific trust duties with respect to a specific trust *res.*[7] A generalized duty of confidence, trust, loyalty or good faith is insufficient for

<hr />

[5] Section 523(a)(4) also encompasses debts for embezzlement and larceny. *See* 11 U.S.C. § 523(a)(4) ("A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—for fraud or defalcation while acting in a fiduciary duty, embezzlement, or larceny."). Embezzlement and larceny are distinct categories of non-dischargeable debts under 11 U.S.C. § 523(a)(4) that do not separately require that the debtor act in a fiduciary capacity. *See Hernandez v. Dorado (In re Dorado),* 400 B.R. 304, 309 (Bankr.D.N.M. 2008)(stating that "[d]ebts may also be declared non-dischargeable under 11 U.S.C. § 523(a)(4) in the absence of a fiduciary relationship when the debts result from a debtor's embezzlement or larceny.")(citing *Tulsa Spine Hospital, LLC v. Tucker (In re Tucker),* 346 B.R. 844, 852 (Bankr.E.D.Okla. 2006)(remaining citations omitted)). Plaintiff has not asserted that the debts at issue are the result of embezzlement or larceny. Consequently, the Court need not consider those alternative grounds under 11 U.S.C. § 523(a)(4).

[6] *See, Tucker,* 346 B.R. at 850 ("'The elements of an express trust are the intent to create a trust, a clearly defined trust res, and specific trust duties.'")(quoting *In re Stefanoff,* 97 B.R. 607 (Bankr.N.D.Okla. 1989)).

[7] *See In re Neal,* 324 B.R. 365, 370 (Bankr.W.D.Okla. 2005), *aff'd,* 342 B.R. 384 (10th Cir. 2006)(explaining that a technical trust is a trust imposed by statute); *Cundy v. Woods (In re Woods),* 284 B.R. 282, 288 (D.Colo. 2001)("A

purposes of establishing a fiduciary capacity within the meaning of 11 U.S.C. § 523(a)(4). *See Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1372 (10th Cir. 1996)(stating that "[n]either a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power is insufficient to establish a fiduciary relationship for purposes of dischargeability.")(internal citations omitted).

The parties' agreement here was oral; there was no written trust document that named a trustee with particularized trust duties and identified specific property that the trustee was required to hold in trust for the benefit of another. Nor has the Plaintiff identified a statute that would give rise to a technical trust with respect to the parties' dealings. In short, there simply is no fiduciary capacity present under the facts presented in this adversary proceeding that would give rise to a non-dischargeable debt within the meaning of 11 U.S.C. § 523(a)(4). The Court, therefore, concludes that Plaintiff's claim under 11 U.S.C. § 523(a)(4) fails.

B. 11 U.S.C. § 523(a)(2) – Fraud

Debts for "money, property, services, or an extension, renewal, or refinancing of credit" are non-dischargeable under 11 U.S.C. § 523(a)(2)(A) to the extent they were procured by "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). To prevail under this non-dischargeability subsection, a plaintiff must establish the following elements by a preponderance of the evidence:[8] 1) the debtor made a false representation; 2) the debtor made the false representation with the intent to deceive the creditor; 3) the creditor relied on the false representation; 4) the creditor's reliance was justified; and 5) the creditor was damaged as a

---

technical trust may arise as a result of defined obligations imposed upon the debtor by a state or federal statute.")(citing *Romero,* 535 F.2d at 622).

[8]*Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)(establishing preponderance of the evidence standard for dischargeability actions).

result.[9]  "False representations are 'representations knowingly and fraudulently made that give rise to the debt.'" *Adams Cnty. Dept. of Soc. Services v. Sutherland-Minor (In re Sutherland-Minor),* 345 B.R. 348, 354 (Bankr.D.Colo. 20060(quoting *Cobb v. Lewis (In re Lewis),* 271 B.R. 877, 885 (10th Cir. BAP 2002)).  False pretenses, as distinguished from false representations, "involve[ ] an implied misrepresentation that is meant to create and foster a false impression." *Gordon v. Bruce (In re Bruce),* 262 B.R. 632, 636 (Bankr.W.D.Pa. 2001)(citing *In re Scarlata,* 127 B.R. 1004, 1009 (N.D.Ill. 1991)).  In other words, "a 'false pretense' is an 'implied misrepresentation or conduct which creates and fosters a false impression, as distinguished from a 'false representation' which is an express misrepresentation." *Stevens v. Antonious (In re Antonious),* 358 B.R. 172, 182 (Bankr.E.D.Pa. 2006)(quoting *In re Haining,* 119 B.R. 460, 463-64 (Bankr.D.Del. 1990)(remaining citations omitted).[10]  "False pretenses have "also been defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor." *Id.* at 182 (citing *In re Barr,* 194 B.R. 1009, 1019 (Bankr.N.D.Ill. 1996)).

     i)     <u>The Vehicles</u>

There are three vehicles for which Mr. Penix testified that he received substitute titles as security for other vehicles at a time when the substituted titles were no longer valid.   Under the parties' evolving oral agreement, Mr. Parra would sell a vehicle, pay Mr. Penix the $500 fee, and "swap titles" by providing Mr. Penix with a substitute vehicle title to secure the remaining balance of the payment.   Those vehicles are:   1991 Toyota Previa – Exhibit 9; 1995 Isuzu Rodeo – Exhibit 12; and 2000 Mitsubishi – Exhibit 15. Mr. Penix based his testimony on CarFax

---

[9]*Lazaron v. Lucas (In re Lucas),* 386 B.R. 332, 337-338 (Bankr.D.N.M. 2008)(citing *Young,* 91 F.3d at 1373 and *Field v. Mans,* 516 U.S. 59, 116 S.Ct.  437, 133 L.Ed.2d 351 1995)(establishing justifiable reliance standard under § 523(a)(2)(A)).
[10]*See also*, *In re Grenier*, 2009 WL 763352, *10 (Bankr.D.Mass. March 19, 2009)(same).

reports that he ran on the titles to these vehicles.   Although the CarFax reports were not offered

into evidence at trial, Mr. Penix's testimony is the only evidence before the Court regarding this

category of vehicles and vehicle titles at issue in this Adversary Proceeding.[11]  Mr. Parra's

deposition testimony does not directly contradict Mr. Penix's testimony offered at trial.

By presenting Mr. Penix with a substitute title for a vehicle that Mr. Parra had already

sold as security for another vehicle, Mr. Parra gave Mr. Penix a false impression that the

substitute title was good.  From this false pretense, and the surrounding facts and circumstances,

the Court can and does infer that Mr. Parra intended to deceive Mr. Penix by securing the unpaid

balance owed by Mr. Parra to Mr. Penix on the original vehicle with an invalid title to a different

vehicle.  Mr. Penix could have protected himself by running a CarFax report at the time Mr.

Parra submitted the substitute title.  But justifiable reliance under 11 U.S.C. § 523(a)(2)(A) is not

measured by what a reasonably prudent person would do under similar circumstances.  *See Field*

*v. Mans,* 516 U.S. 59, 77, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)(vacating the bankruptcy

court's judgment which was based on application of an objective, reasonably prudent man

standard, finding that such a standard "clearly exceeds the demand of justifiable reliance that we

hold to apply under § 523(a)(2)(A).").   Justifiable reliance is, therefore, measured by a

subjective standard. *Johnson v. Riebesell (In re Riebesell),*586 F.3d 782, 792 (10th Cir. 2009).

Justifiable reliance nevertheless requires the plaintiff to "'use his senses' and at least make a

'cursory examination or investigation' of the facts of the transaction before entering into it."  *Id.*

(quoting *Field v. Mans,* 516 U.S. at 71, 116 S.Ct. 437).  Reliance is not justifiable if the facts and

circumstances make it apparent from a cursory glance that the representations are false, or where

the creditor "'has discovered something which should serve as a warning that he is being

---

[11]Mr. Parra objected to the admissibility of testimony about the contents of the CarFax reports solely on the ground
that the testimony was hearsay.  The Court overruled the hearsay objection.

deceived.'" *The William W. Barney, M.D. P.C. Retirement Fund v. Perkins (In re Perkins),* 298 B.R. 778, 792 (Bankr.D.Utah 2003)(quoting *Field,* 516 U.S. at 71, 116 S.Ct. 437)(citing W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)).[12]

No evidence was presented to the Court that would indicate that the vehicle titles Mr. Parra submitted to Mr. Penix as substitute security were obviously invalid when presented, or that standard industry practice was to obtain and review a CarFax report to verify the validity of the title. Given the course of the parties' dealings, it was not unjustified for Mr. Penix to rely on Mr. Parra's representation that the substitute titles were valid. The Court, therefore, finds that Mr. Penix justifiably relied on the validity of the vehicle titles Mr. Parra submitted as substitute security for additional vehicles. And because Mr. Penix never received payment for those vehicles, Mr. Parra's misrepresentation caused Mr. Penix to sustain a loss. The Court, therefore, concludes that the debt owing on the three vehicles described above is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

    ii)    <u>The Checks</u>

Mr. Penix asserts that the five checks at issue constitute a non-dischargeable debt under 11 U.S.C. § 523(a)(2)(A). Mr. Penix reasons that because Mr. Parra never told Mr. Penix to deposit the checks, the checks were not good when Mr. Parra presented them to Mr. Penix. Consequently, Mr. Penix urges the Court to infer that Mr. Parra fraudulently presented a bad check to Mr. Penix. Based on the evidence presented, the Court cannot make that inference.

A worthless check can form the basis of a non-dischargeable debt under 11 U.S.C. § 523(a)(2)(A). *See, e.g., American Furniture v. Bell (In re Bell),* 2006 WL 3082110, *2 n.11 (Bankr.D.Kan. 2006)(collecting cases). However, the issuance of a "bad check" is insufficient,

---

[12]*See also State of Missouri v. Audley (In re Audley),* 268 B.R. 279, 282 n.7 (Bankr.D.Kan. 2001)(stating that "reliance is not justifiable if the recipient of the misrepresentation could have appreciated its falsity at the time by the use of his senses.")(citing *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.3d2d 351 (1995)).

on its own, to establish that the debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).  *See*

*KC Coring & Cutting Constr., Inc. v. McArthur (In re McArthur,* 391 B.R. 453, 457

(Bankr.D.Kan. 2008)("An insufficient funds check, standing alone, is not a false statement [for

purposes of § 523(a)(2).")(citations omitted); *In re Strecker,* 251 B.R. 878, 882 (Bankr.D.Colo.

2000)(stating that "[t]he mere issuance of a 'bad check,' standing alone, is not grounds for a

determination that such debt is not dischargeable pursuant to 11 U.S.C. § 523(a)(2).")(citing *In

re Davis,* 246 B.R. 646, 652 (10th Cir. BAP 2000)).   To prevail on a non-dischargeability claim

under 11 U.S.C. § 523(a)(2)(A), premised on an insufficient funds check as a debt for money

obtained by a debtor's "false pretenses, false representation, or actual fraud," a plaintiff must

demonstrate that the debtor did not intend to pay the creditor at the time that the check was

issued and knew at the time the check was presented that there would be insufficient funds in the

debtor's account to cover the check upon presentment in accordance with the parties' agreement.

*See Strecker,* 251 B.R. at 882 ("A determination that such a debt is non-dischargeable can only

be established if the debtor did not intend to pay the creditor when the check was issued and

knew the check would bounce.")(citing *Jarboe Sales Co. v. Degraffenreid (In re Degraffenreid),*

131 B.R. 178, 180 (Bankr.N.D.Okla. 1991)).[13]

Here, there is no evidence before the Court that there were insufficient funds in Mr.

Parra's account to cover the checks at issue when presented or that the checks would have been

dishonored if presented in accordance with the parties' agreement.  Mr. Penix eventually made

---

[13]*See also, McArthur,* 391 B.R. at 457 (stating that "[t]he creditor must also prove the debtor made a misrepresentation with intent to defraud *in direct connection with* issuing the check[;] . . . .the debtor must have fraudulently obtained money, property, services or credit in contemporaneous exchange for a check which the debtor knew would not later be honored.")(emphasis added)(citation omitted)); *Meramec Valley Bank v. Newell (In re Newell),* 164 B.R. 992, 995 (Bankr.E.D.Mo. 1994)(surrounding circumstances demonstrating that the debtor knew that there were insufficient funds in the account upon which the debtor wrote checks, established that the debtor knew that the representations were false when such representations were made for purposes of 11 U.S.C. § 523(a)(2)(A)).

an unsuccessful attempt to deposit the checks at issue, but the checks were dishonored because they were stale, not because there were insufficient funds in the account. Mr. Penix deposited other checks that were written after the dates the checks at issue were written, and all of those later checks cleared the bank. Mr. Penix testified at trial that he believed Mr. Parra intended to make the checks good when Mr. Parra presented them to Mr. Penix for payment. Mr. Penix also testified that Mr. Parra never called to tell him to deposit the checks as was the parties' custom. But nor did Mr. Penix take any action to follow up with Mr. Parra regarding the checks after the expiration of the parties' customary waiting period. Mr. Penix has, therefore, failed to offer sufficient evidence, circumstantial or otherwise, that Mr. Parra knew that the checks were worthless when they were presented and intended to defraud Mr. Penix. The Court therefore concludes that the checks at issue are dischargeable.

C.  11 U.S.C. § 523(a)(6) - Conversion

Debts arising from a debtor's willful and malicious injury to property of another are non-dischargeable under 11 U.S.C. § 523(a)(6). That section provides:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

In the Tenth Circuit, non-dischargeability under this subsection requires that the debtor's actions be both willful and malicious. *Panalis v. Moore (In re Moore),* 357 F.3d 1125, 1129 (10th Cir. 2004)("Without proof of *both* [willful and malicious elements under 523(a)(6)], an objection to discharge under that section must fail.")(emphasis in original); *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley),* 235 B.R. 651, 655 (10th Cir. BAP 1999)(stating that "[i]n the Tenth Circuit, the phrase 'willful and malicious injury' has been

interpreted as requiring proof of two distinct elements – that the injury was both 'willful' and 'malicious.'"). The "willful" element requires both an intentional act and an intended harm; an intentional act that leads to harm is not sufficient.[14]  The Tenth Circuit has articulated the "willful" component as requiring proof that the debtor "must 'desire  . . . [to cause] the consequences of his act . . . or believe [that] the consequences are substantially certain to result from it." *Longley,* 255 B.R. at 657.  Whether the debtor had the requisite intent to harm is evaluated under a subjective standard that focuses on the debtor's state of mind.[15]  Evidence of the debtor's state of mind may be inferred from the circumstances.[16]  An intentional breach of contract, without more, is insufficient to sustain a non-dischargeable claim under 11 U.S.C. § 523(a)(6).[17]

---

[14] *See Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90  (1998)(holding that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury.")(emphasis in original).  "[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at  64.

[15] *Longley,* 235 B.R. at 657 (focusing on the debtor's subjective intent and stating that "[w]illful injury may be established by direct evidence of specific intent to harm a creditor or the creditor's property" (citing *CIT Fin. Services, Inc. v. Posta (In re Posta),* 866 F.2d 364, 367 (10th Cir. 1989) . . . . [and] . . .  may also be established indirectly by evidence of both the debtor's knowledge of the creditor's lien rights and the debtor's knowledge that the conduct will cause particularized injury." (citing *Dorr, Bentley & Pecha, CPAs P.C. v. Pasek (In re Pasek),* 983 F.2d at 1524, 1527 (10th Cir. 1993)).  *Accord In re Patch,* 526 F.3d 1176, 1180 (8th Cir. 2008)(stating that "the 'willful' element is a subjective one . . . ").

[16] *See Nat'l Labor Relations Board v. Gordon (In re Gordon),* 303 B.R. 645, 656 n.2 (Bankr.D.Colo. 2003)(noting that "[w]hen the Court is presented with proof of intentional act by a debtor and proof that the act perpetrated by the debtor was certain to cause injury, the Court believes that it is absolutely permissible to infer the ultimate fact of actual intent to cause injury from those evidentiary facts.")(citations omitted).

[17] *See, e.g., Palazzolo v. Colclazier (In re Colclazier),* 134 B.R. 29, 33 (Bankr.W.D.Okla. 1991)(stating "that §523(a)(6) exempts from discharge only damages from tortious breaches of contract"  and declining to broaden the reach of § 523(a)(6) to intentional breaches of contract);  *Conway Bank, N.A. v. Phillips (In re Phillips),* 2007 WL 2083610, *4 (Bankr.D.Kan. July 17, 2007)(cautioning that "'[c]ourts  must be careful not to equate a breach of a contract, which happens to be a security agreement, with conduct causing willful and malicious injury.")(citing 4 Collier on Bankruptcy ¶ 523.12[3] (Alan N. Resnick and Henry J. Sommer, eds.-in-chief, 15th ed. rev. 2006)).  *See also, In re Jercich,* 238 F.3d 1202, 1205 (9th Cir. 2001)(stating that "although § 523(a)(6) *generally* applies to torts rather than to contracts and an intentional breach of contract *generally* will not give rise to a nondischargeable debt, where an intentional breach of contract is accompanied by tortious conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under § 523(a)(6).")(emphasis in original)(citations omitted).

After *Geiger,* some courts have determined that "willful and malicious" has been compressed into a single standard.[18]  Indeed, courts, including the Tenth Circuit, have defined "malicious" in terms that seem equivalent to the definition of "willful" under the *Geiger* standard.  *See, Moore,* 357 F.3d at 1129 (stating that the "malicious" component "requires proof 'that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury.'")(quoting *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1164 (11th Cir. 1995)).[19]  But because the Tenth Circuit directs that willful and malicious are separate, distinct requirements, "malicious" must be defined so that it is distinguishable from "willful." This Court concludes that the "malicious" component of 11 U.S.C. § 523(a)(6)  requires an intentional, wrongful act, done without justification or excuse.[20]

Conversion of a creditor's property interest can support a non-dischargeability claim under 11 U.S.C. § 523(a)(6).[21]  As explained by the Supreme Court in *Davis v. Aetna Acceptance Co.,*

---

[18]*See, e.g., Williams*, 337 F.3d at 509 ("The test for willful and malicious injury under Section 523(a)(6), thus, is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor.")(quoting *Miller v. J.D. Abrams, Inc. (In re Miller),* 156 F.3d 598, 606 (5th Cir. 1998). *See also, Tinkler* 311 B.R. at 879 (noting confusion exists in the case law as to whether the Supreme Court's decision in *Geiger* "essentially collapsed the 'willful and malicious' inquiry into a unitary standard that embraces both willfulness and malice" but finding that the court must give effect to each element of the statute, i.e., both the willful and the malicious components of § 523(a)(6).").

[19]*See also, Musgrave,*  2011 WL 312883, at *11 (to be excepted from discharge under 11 U.S.C. § 523(a)(6),  "the injury itself must be desired and in fact anticipated by the debtor in order for the debt to be excepted from discharge.")(citations omitted).

[20]*See, e.g., Tinkler,* 311 B.R. at 880 (finding that "the malice prong of 11 U.S.C. § 523(a)(6) is satisfied upon a showing [that] the injury was inflicted *without just cause or excuse.*")(citations omitted)(emphasis in original); *America First Credit Union v. Gagle (In re Gagle),* 230 B.R. 174, 181 (Bankr.D.Utah 1999)(finding that "[i]n order for an act to be willful and malicious it must be a deliberate or intentional injury (willful) that is performed without justification or excuse (malicious)."); *Saturn Systems, Inc. v. Militare (In re Militare),* 2011 WL 4625024, *3 (Bankr.D.Colo. 2011)("a *malicious* act under § 523(a)(6) is a 'wrongful act, done intentionally, without just cause or excuse.'")(quoting *Tinkler,* 311 B.R. at 880 (quoting *Tinker v. Colwell,* 193 U.S. 473, 486, 24 S.Ct. 505 (1904)); *Tso v. Nevarez (In re Nevarez),* 415 B.R. 540, 544 (Bankr.D.N.M. 2009)("'Malicious' requires that an intentional act be 'performed without justification or excuse.'")(quoting *Gagle,* 230 B.R. at 181)).  *But cf. McCain Foods USA, Inc. v. Shore (In re Shore),* 317 B.R. 536, 543 (10th Cir. BAP 2004)(pointing out that "neither *Geiger* nor the Tenth Circuit have explicitly addressed whether a plaintiff must demonstrate that an injury occurred without just cause or excuse in a § 523(a)(6) proceeding or even what circumstances might establish such an element[.]").

[21] *Longley,* 235 B.R. at 657 (acknowledging that "conversion can, under certain circumstances, give rise to a non-dischargeable debt pursuant to § 523(a)(6)."); *Bank of Utah v. Auto Outlet, Inc. (In re Auto Outlet, Inc.),* 71 B.R. 674, 676 (Bankr.D.Utah 1987)("Although this section does not specifically mention conversion, 'willful and malicious injury' was intended to include 'willful and malicious conversion.'")(citing 124 Cong.Rec.H.11096 (daily

23

293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), decided under subsection (6) of § 17(a) of the

Bankruptcy Act of 1898, the precursor to 11 U.S.C. § 523(a)(6),

> There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception . . . . But a willful and malicious injury does not follow as a matter of course from every act of conversion, without reference to the circumstances.   There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice.

> 293 U.S. at 332 (citations omitted).

Mr. Parra admitted in his deposition testimony that he obtained duplicate titles for three

vehicles:   1)  1992 Lincoln – Exhibit 11;   2) 1999 GMC – Exhibit 13;  and 3) 2002 Suzuki –

Exhibit 14.  There are four additional vehicles that Mr. Penix testified, based on his review of the

CarFax reports, were sold using duplicate titles *after* the time Mr. Parra provided Mr. Penix with

titles for those vehicles as security for debt owed on different consigned vehicles.    Those

vehicles are:   1994 Ford Escort – Exhibit 2;  2000 Ford Explorer – Exhibit 5; 1998 Buick

LeSabre – Exhibit 6;  and 1999 Ford Expedition – Exhibit 10;

Under the parties' agreement, Mr. Parra could not sell a vehicle and deliver title to the

buyer without obtaining the original title from Mr. Penix. Mr. Penix held the original titles to

ensure he would be paid before title would pass to the buyer.  By selling and transferring title to

the vehicles to the buyers by use of duplicate titles without obtaining the original titles from Mr.

Penix and without paying Mr. Penix for the vehicles, Mr. Parra deprived Mr. Penix of his

security interest in the vehicles.   Mr. Parra attempts to characterize his actions as a mere breach

of the parties' oral agreement.   This Court disagrees.   From the surrounding facts and

circumstances the Court infers that Mr. Parra's actions were both willful *and* malicious.   Such

actions were willful because Mr. Parra knew at the time that he obtained a duplicate title and

---

ed. Sept. 28, 1978); S. 17412 (daily ed. Oct. 6, 1978) (statement of Rep. Edwards and Sen. DeConcini)); *Borg-Warner Acceptance Corp. v. Shah (In re Shah),* 96 B.R. 290, 293 (Bankr.D.C.Cal. 1989)("The tort of conversion is one type of wrongful behavior that may be nondischargeable under Section 523(a)(6).")(citations omitted).

used the duplicate title to transfer title to a buyer that he was in financial difficulty, and that he

was depriving Mr. Penix of his security interest in the vehicle. No other inference can be made.

Mr. Parra's deposition testimony that their arrangement was that he would *eventually* get the

titles from Mr. Penix does not excuse his action. In fact, he never obtained the titles to these

vehicles from Mr. Penix, nor did he pay Mr. Penix for these vehicles. There is no evidence that

Mr. Penix was aware of or acquiesced in Mr. Parra obtaining duplicate titles. Such actions were

malicious because Mr. Parra intentionally deprived Mr. Penix of his collateral without just cause

or excuse, knowing that such conduct would harm Mr. Penix. Thus the malicious component has

also been satisfied.[22]

   D.  The remaining vehicles

   Whether proceeding under 11 U.S.C. § 523(a)(2)(A) or 11 U.S.C. § 523(a)(6), the

creditor bears the burden of proving each element by a preponderance of the evidence. *Grogan,*

498 U.S. at 291, 111 S.Ct. 654. Mr. Penix testified that when he visited Mr. Parra's car sales lot

one Sunday morning in February of 2009, he did not see any of the vehicles he provided to Mr.

Parra on the lot. In closing argument, counsel for Mr. Penix asserted that such testimony shifted

the burden of going forward to Mr. Parra to explain what happened to the vehicles. Mr. Parra

testified at his deposition that he had some of the vehicles moved from his lot to a storage

facility. *See* Exhibit 25, Parra Deposition, pp. 31-32. Even if it were appropriate to shift the

burden of going forward to Mr. Parra, the ultimate burden of persuasion as to the non-

dischargeability claims raised in this adversary proceeding remains with Mr. Penix. *See Matter*

*of Dino,* 17 B.R. 316, 319 (Bankr.Fla. 1982)(acknowledging that "the burden of going forward

---

[22]*But cf. Tinkler,* 311 B.R. at 882-883 (declining to find that the debtor's sales of collateral subject to creditor's security interest constituted a willful and malicious injury where 1) the debtor and creditor had longstanding business relationship; 2) the debtor testified that he believed his business would continue operating and that he would eventually pay the creditor what it was owed; 3) no evidence was presented to demonstrate that proceeds were used for anything other than business purposes; and 4) and the parties' agreement lacked clarity.).

with the evidence may occasionally shift" but that "the ultimate burden remains with the Plaintiff.").[23]   Insufficient evidence was presented to sustain a non-dischargeability claim with regard to the following eight vehicles:   1999 Grand Am – Exhibit 1;  1994 Chevrolet Lumina – Exhibit 3;  1991 Isuzu Rodeo – Exhibit 4; 1999 Dodge – Exhibit 7;  1999 Oldsmobile – Exhibit 8; 1994 Isuzu Rodeo – Exhibit 16; 1994 Jeep – Exhibit 17;  and 2002 Mitsubishi Galant – Exhibit 18.   Mr. Penix's testimony that he could not locate these vehicles when he scouted out Mr. Parra's lot falls well short of establishing the willful and malicious elements necessary to a non-dischargeability claim under 11 U.S.C. § 523(a)(6).   Nor does such testimony demonstrate that Mr. Parra made any misrepresentation to Mr. Penix with regard to these vehicles that could form the basis of a non-dischargeability claim under 11 U.S.C. § 523(a)(2)(A).

E.   The amount of the non-dischargeable debt

The parties maintained a list of vehicles and the Release Prices for each vehicle that Mr. Penix provided to Mr. Parra for sale on consignment.  Mr. Penix testified that he did not receive payment for any of the vehicles at issue in this adversary proceeding.  Nor did Mr. Parra return the vehicles to Mr. Penix.   However, the parties' agreement with regard to the "swapped titles" was that Mr. Parra would pay Mr. Penix the $500 fee and secure the balance of the price with a substitute title.   There is insufficient evidence before the Court to establish that Mr. Parra failed to pay Mr. Penix the $500 fee in connection with the swapped titles contrary to the parties' agreement.   Consequently, for the vehicles with swapped titles, the purchase price reflected on Mr. Penix's inventory list must be reduced by $500 per vehicle to arrive at the appropriate damage amount.   As analyzed above, the following vehicles give rise to a non-dischargeable debt under either 11 U.S.C. § 523(a)(2)(A) or 11 U.S.C. § 523(a)(6):

---

[23]*Cf. Sears, Roebuck and Co. v. Green (In re Green),* 296 B.R. 173, 179 (Bankr.C.D.Ill 2003)(even with the presumption of nondischargeability under 11 U.S.C. § 523(a)(2)(C), the ultimate burden of proof remains on the creditor).

| Vehicle | Release Price | Damage Amount |
|---|---:|---:|
| 1994 Ford Escort – Exhibit 2 | $2,600.00 | $2,600.00 |
| 2000 Ford Explorer – Exhibit 5 | $3,000.00 | $2,500.00 |
| 1998 Buick LeSabre – Exhibit 6 | $2,900.00 | $2,400.00 |
| 1991 Toyota Previa – Exhibit 9 | $2,500.00 | $2,000.00 |
| 1999 Ford Expedition – Exhibit 10 | $4,220.00 | $3,720.00 |
| 1992 Lincoln – Exhibit 11 | $2,000.00 | $2,000.00 |
| 1995 Isuzu Rodeo – Exhibit 12 | $3,500.00 | $3,000.00 |
| 1999 GMC – Exhibit 13 | $6,800.00 | $6,800.00 |
| 2002 Suzuki – Exhibit 14 | $4,000.00 | $4,000.00 |
| 2000 Mitsubishi – Exhibit 15 | $5,150.00 | $4,650.00 |

**TOTAL DAMAGES:  $33,670.00**

CONCLUSION

Based on the foregoing, the Court concludes that a portion of the debt relating to Mr. Parra's obtaining duplicate titles for vehicles thereby invalidating Mr. Penix's security interest in those vehicles constitutes a non-dischargeable debt under 11 U.S.C. § 523(a)(6).   An additional portion of the debt relating to Mr. Parra's false pretenses in providing invalid substitute titles as security for the balance due on other vehicles constitutes a non-dischargeable debt under 11 U.S.C. § 523(a)(2)(A).   The remainder of the debt at issue in this adversary proceeding is dischargeable.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law issued in accordance with Rule 7052, Fed.R.Bankr.P. The Court will enter a separate judgment consistent with this memorandum opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket:   September 18, 2012

COPY TO:

**Stephen P Curtis**
Stephen P. Curtis, Attorney at Law, P.C.
Attorney for Plaintiff
6747 Academy Rd NE Ste D
Albuquerque, NM 87109-3372

**Gregory Abelicio Baca**
Baca, Findlay, & Dziak, LLC
Attorney for Defendants
3500 Comanche NE Bldg. B
Albuquerque, NM 87107